**In re KLIEGL BROS. UNIVERSAL ELEC. STAGE LIGHTING CO., INC., Debtors.**

**Bankruptcy No. 191–13001–352.**

United States Bankruptcy Court, E.D. New York.

Sept. 9, 1999.

A. Peter Lubitz, Kirk L. Brett, Rosenman & Colin LLP, New York City, for movant.

Laurence Y. Solarsh, White Plains, NY, for Richard Davisson.

William Greenberg, White Plains, NY, for Lawrence Gottlieb.

**Decision on Administrative Creditor's Motion for Sanctions for Debtor's Final Report and Application Seeking a Final Decree**

MARVIN A. HOLLAND, Bankruptcy Judge.

Donovan Leisure Newton & Irvine[1] (DLNI or Movant) seeks sanctions from Debtor's counsel and former principal pur-

1. Since this matter was heard by the Court, DLNI has disbanded. (See, N.Y.L.J. 4/17/98, p. 1, col. 1.)

suant to Fed.R.Bankr.P. 9011,[2] 28 U.S.C. § 1927, and the inherent powers of the court for misrepresentations and omissions in Debtor's final report and *ex parte* application for a final decree (the application). Movant asserts that sanctions are appropriate because Debtor's application was intentionally and materially misleading in failing to adequately inform the court of Debtor's precarious financial condition and in misrepresenting the status of Movant's unpaid administrative claim. After a series of hearings, we find that the facts surrounding the filing of the application and the proliferation of proceedings spawned by the application warrant the imposition of sanctions. We conclude that we have authority to impose sanctions and direct that a further hearing be held to determine their magnitude.

## I. HISTORY

The plan of reorganization of Kliegl Bros. Universal Electric Stage Lighting Co., Inc., (Kliegl) confirmed in 1992 resulted in an outsider, Richard Davisson, acquiring a controlling equity interest in the Debtor (Dec. 9 Tr. at 135 and 137–139, 162), an old-line highly respected manufacturer of stage and commercial lighting. Davisson is a well-educated and experienced investment broker and advisor who invests in what he described as a "diverse group of often start-up companies." (12/9/97 Tr. at 5, 121–126.)

Kliegl was already in Chapter 11 when an investment banker who had previously done business with Davisson brought the Debtor to Davisson's attention. (*Id.* at 127–128.) Davisson was attracted by the possibility of Kliegl's obtaining lucrative contracts,[3] and his attraction led to a commitment. During the reorganization management was replaced by an operating trustee who was pressed by Davisson to propose a plan. (*Id.* at 137.) Under the plan ultimately filed by the Trustee, Davisson became the principal investor, shareholder and director in the reorganized entity. (*Id.* Tr. at 142.) Kliegl's disclosure statement provided that "Mr. Davisson shall fund, to the extent necessary, fees as allowed", (12/9/97 Tr. at 11),[4] and at confirmation Davisson made a critical $150,000 capital contribution.[5] After confirmation Davisson continued to fund the reorganized debtor with additional cash. (12/9/97 Tr. at 41–43; 1/12/98 Tr. at 16.) However, when the anticipated new business failed to materialize (1/12/98 Tr. at 55), Kliegl ceased operations in November of 1996 (12/9/97 Tr. at 63) without having made all of the payments required by its confirmed plan. (12/9/97 Tr. at 163.)

2. Fed.R.Bankr.P. 9011 has been amended since the occurrence of the significant facts related herein, and the parties agree that the pre-December 1997 version of 9011 applies. (2/23/98 Tr. at 21.) Moreover, as a general rule "the propriety of sanctions should be gauged by the standard in effect at the time the alleged offensive conduct occurred." *In re 680 Fifth Ave. Assoc.*, 218 B.R. 305, 312 (Bankr.S.D.N.Y.1998) (citing cases). Unless otherwise specifically noted, all references to that rule are to the rule in effect at the time of the behavior discussed.

3. *See* 1/12/98 Tr. at 30–31 ("Kliegl believed it was on the verge of earning a very large order from the Dormitory Authority in [sic] the State of New York. That was one of the reasons for financing it through the Chapter 11"); 12/9/97 Tr. at 47 ("We lived through the whole period of the company believing there was a single series of large orders just around the corner, and that was the rationale for keeping it alive").

4. A letter from Davisson to the Trustee provided: "This will confirm that I am prepared and intend to fund Kliegl Brothers cash requirements at confirmation as allowed and its operating needs according to the forecast contained in the Plan [sic] long as sales and margins contained therein are attained." (Mov.'s Ex. 1, Ex. I to the Disclosure statement) (12/9/97 Tr. at 139). This representation was bolstered by a letter referred to in the Kliegl disclosure statement from Davisson's Certified Public Accountant stating: "In my opinion, Richard Davisson has the ability and liquidity to finance the obligation under the plan to reorganize Kliegl Brothers ..." (12/8/97 Tr. at 177.)

5. The Plan was confirmed on October 2, 1992. (Docket Doc. # 159.)

Among the creditors that did not receive all anticipated plan payments was the law firm of DLNI which held a sizable administrative claim for its service as Debtor's counsel prior to the appointment of the Chapter 11 operating trustee. Davisson claims to have reached an oral agreement with DLNI on the eve of confirmation (12/9/97 Tr. at 21, 145) ("in late June or July of 1992") under which Kliegl would not object to DLNI's fee application[6] in exchange for DLNI's agreement to accept payments on its claim at a rate of three percent of Kliegl's sales per month. (12/8/97 Tr. at 217). Davisson admits that he did not have authority to bind Kliegl at the time of the agreement. (12/9/97 Tr. at 22.)[7] DLNI denies the existence of the agreement altogether (12/8/97 Tr. at 36, 99, 101, 106–109), but an affidavit by Peter Lubitz made in support of DLNI's fee application states that an agreement for counsel fees had been reached with Kliegl. DLNI also claims that Davisson actually personally guaranteed DLNI's fees. (1/12/98 Tr. at 184–5; Davisson Exh., Docket Doc. # 245, Ex. DA).

On November 2, 1993, following a chamber's conference initiated by DLNI, and while a decision on DLNI's fee application was still pending, this Court entered an order directing Kliegl to deposit 3% of its monthly revenues into an escrow account pending a final decision on DLNI's fee application. (the "Deposit Order"). (12/8/97 Tr. at 218, 317, 410–412.) Kliegl's compliance with the Deposit Order, however, was short-lived; payments ceased after several months (in or around June 1994) (12/9/97 Tr. at 35) resulting in DLNI receiving only $4,180.46. (Docket Doc. # 235, Ex. 27.) No other payments were made to DLNI by Kliegl, (12/8/97 Tr. at 218) leaving DLNI as the reorganized debtor's only major unpaid administrative creditor.[8]

In October 1995, Kliegl's first final report dated October 14 and first *ex parte* application dated October 16, 1995 seeking a final decree (the first application) were filed. Kliegl was then represented by Lawrence Gottlieb (Gottlieb),[9] who states that he prepared the application at Davisson's request in order to remove the "stigma attached to being a Chapter 11 debtor." (12/8/97 Tr. at 221; 1/12/98 Tr. at 30–31.) Gottlieb maintains that he relied on Davisson's representations that the state-

**6.** The grounds for Kliegl's opposition would have been DLNI's alleged conflict of interest addressed by this court. *See In re Kliegl Bros. Universal Electric Stage Lighting Co., Inc.*, 149 B.R. 306 (Bankr.E.D.N.Y.1992); 12/8/97 Tr. at 267.

**7.** Although unarticulated as such, Davisson's position appears to be that DLNI agreed to cap its entitlement at the three per cent amount. DLNI's unarticulated position seems to be that DLNI, as a non-binding accommodation to Kliegl, "at will," would accept monthly payments at the three per cent rate but only until further notice by DLNI. This position is supported by the only written evidence of the agreement, a January 19, 1996 letter from Edward F. Cox, a DLNI attorney.

**8.** While the record is unclear, Peter Lubitz, in a letter to Kliegl seeking compliance with the deposit order, identifying DLNI as the only unpaid administrative creditor. (Docket Doc. 235, Ex. 16 .)

**9.** Davisson retained Gottlieb to represent Kliegl because Gottlieb had been an associate in the law firm of Marc Stuart Goldberg & Associates which had represented the trustee during the Chapter 11 case. (1/12/98 Tr. at 80–82.) Goldberg had been Kliegl's trustee and had proposed the plan of arrangement that was ultimately confirmed. Gottlieb had actively participated in the case by assisting in the drafting of the disclosure statement. (12/8/97 Tr. at 172, 174, 207.) In December 1993 Gottlieb went on to form an "of counsel" relationship with Kurtzman Haspel & Stein where he provided services to Kliegl (12/8/97 Tr. at 278–9, 339) on matters relating to the Kliegl lease and opposing an attempt by John Kliegl to convert or dismiss the case. (12/8/97 Tr. at 280–1; Docket Doc. # 235, Ex. 34) At some point in 1995, after Gottlieb had gone on to open his own practice, he again represented Kliegl (12/8/97 Tr. at 279–281, 12/9/97 at 43, 1/12/98 Tr. at 30, 79; Docket Doc. # 235, Ex. 25) and prepared the final reports and applications to close the case. (12/8/97 Tr. at 282, 284; 12/9/97 at 43). Davisson stated that he never retained Gottlieb personally. (1/12/98 Tr. at 80.)

ments contained in the final report were true. (12/8/97 Tr. at 225; 1/12/98 Tr. at 34–35.) According to Davisson, he and Gottlieb had a conversation during which Gottlieb confirmed with Davisson that the facts contained in the final report were true and Gottlieb advised Davisson that Kliegl had satisfied the requirements for a final decree because he had concluded that the conditions necessary and sufficient to effect substantial consummation had occurred. (12/9/97 Tr. at 46–7, 64; 1/12/98 Tr. at 32–33). No testimony was offered to indicate that there was any discussion with regard to the requirement [10] that the estate be fully administered. The final report, signed by Davisson as Treasurer of Kliegl, and by Gottlieb as its attorney, provided in relevant part:

2. Pursuant to the Plan, substantial consummation was defined as the date that first distribution to Class 4 Claimants under the Plan were made.

3. First distribution payments under the Plan on account of the sole Class 4 Claimant, John Kliegl, have been made.

4. Allowed Administrative claims have been paid in full or pursuant to agreement.

5. Debtor's Plan has been substantially consummated.

6. The estate is ready to be closed and a Final Decree effecting the same should issue.

(The full text of the final report and application is attached as an appendix to this decision.) No statement was made as to any payment schedule for various claims as required by the confirmed plan of reor-

ganization.[11] (Docket Doc. # 235, Ex. 2.) And nothing in this first final report nor its accompanying first *ex parte* application made any mention of Kliegl's failure to comply with an outstanding deposit order or of DLNI's unpaid administrative claim. We denied this application to close the case because of a pending fee application of DLNI.

In late November 1995, Davisson met with DNLI to discuss Kliegl's dire financial condition. Davisson claims to have offered Peter Lubitz the keys to Kliegl at one point. (1/12/98 Tr. at 37–39.) Several weeks later, a decision was rendered granting in full DLNI's long pending application seeking nearly $150,000 in fees and expenses. Davisson claims that shortly after the release of the decision, DLNI denied the existence of the fee agreement and sought full payment of the fees awarded. (21/9/97 Tr. at 51; 1/12/98 Tr. at 40–41.) On January 16, 1996 Davisson faxed a letter to DLNI in which among other things, he stated his reluctance to continue Kliegl's funding without assurances that DLNI would limit its claim for fees consistent with the Deposit Order:

I understand that this is an unpleasant subject for you. For me it [Davisson's involvement with Kliegl] is a disaster on its way to becoming a dead duck. However we might feel about the experience, I must ask again, as I did Thursday, "Are you prepared to honor the simple understanding of October 1992, without embellishments, or not?" Payroll [to be funded by Davisson or a member of his family] must be wired in by noon today or we have a 5⁄10 chance of a walkout tomorrow by our ten member

---

10. 11 U.S.C. § 350(a), Fed.R.Bankr.P. 3022.

11. Article V of the Plan set forth treatment of claims and interests. General Unsecured claims (Class 6 creditors), for example, were "to be satisfied by periodic payments of cash which shall be in an aggregate amount equal to fifteen (15%) percent of an Allowed Class 6 Claim, of which two and one-half (2½%) percent shall be distributed in cash thirty days following the Effective Date," with similar 2½

% payments at later defined intervals. "Effective Date" is defined in the plan as "the first Business Day after the Confirmation Order has become a Final Order." The final report and Gottlieb's application are silent as to whether any payments, aside from the payment to John Kliegl (which was all that was required under the Plan to reach substantial consummation), were made.

union shop, followed not long after by our seven other employees. (Docket Doc. # 235, Ex. 25.)

Under date of January 19, 1996, by way of written response, DLNI indicated its non binding willingness to accept payments from Kliegl consistent with the deposit order without limiting its claim to such amounts as follows:

This letter confirms that, without waiver of any our rights or remedies *and until otherwise noticed to you by this Firm,* this Firm will accept payment from Kliegl Bros. amounts of fees and disbursements granted to us pursuant to Judge Holland's December 28, 1995, decision (the "Award Amount"): (I) a lump sum payable forthwith equal to three percent of the gross revenues of Kliegl from the date of confirmation of the Chapter 11 plan to December 31, 1995, and (ii) three percent of Kliegl's gross revenues in each month thereafter payable as soon as practicable in the following month until the entire Award Amount is received by us. (Docket Doc. # 235, Ex. 26.) (Emphasis supplied.)

The parties differ as to whether DLNI had agreed to limit the amount of its administrative fee claim to the three percent of Kliegl's monthly revenues mandated in the earlier mentioned payment order or whether DLNI had merely voluntarily engaged in a non binding accommodation. The only writing evidencing this agreement is the above letter.

The fact that by January 16, 1996 Kliegl was in extremis,[12] completely dependent on Davisson's discretionary cash infusions and

**12.** Davisson's fax dated January 16, 1996, also pointed out that Kliegl owed "well over $1 million in claims to the landlord, various taxing authorities and creditors—some of whom are suing now to collect. Shame on me for seeing an opportunity where there wasn't one."

**13.** Davisson however, had stayed busy during the summer of 1996. While apparently still an officer of the apparently insolvent corporation, (he later signed Kliegl's Chapter 7 petition as president) Davisson unsuccessfully attempted to assign his claims against Kliegl to

on its way to being a "dead duck" was noticeably absent from a second final report and application seeking a final decree filed by Gottlieb on January 19, 1996, after the decision on DLNI's fee application had been rendered. This application, resubmitted at Davisson's request, (12/9/97 Tr. at 64, 84; 1/12/98 Tr. at 47) was identical to the original. Again, the status of Kliegl's unpaid obligation under the deposit order was not revealed (1/12/98 Tr. at 48), nor did the second application make any mention of the then still yet-to-be resolved dispute over DLNI's fees or note that first payments to some creditors had not been made. The resubmitted ex parte application was granted, and the final decree was docketed in March of 1996.

Success in obtaining the final decree and removal of the Chapter 11 "stigma", however did not help Kliegl. After scaling back operations and laying off employees, Kliegl staggered on until November, 1996 when it ceased operations. Alone, Davisson packed up Kliegl's few remaining assets consisting primarily of small equipment and drawings, and drove them to a warehouse near his residence in Maine.[13] (1/12/98 Tr. at 57–60).

The case remained dormant until May 15, 1997 when DLNI filled a motion seeking: (1) to reopen this Chapter 11 case, (2) compel compliance with orders directing payment of DLNI's fees, (3) sanctioning Debtor and its responsible officers, directors, and principals for willful failure to comply with prior orders of the court regarding compensation,[14] and (4) conversion

a related entity—"Kliegl Lighting"—in order to foreclose on his interest in the Debtor, but the effort was unsuccessful because the assignments were ineffective. (1/12/98 Tr. at 54, 71–72.) It is unclear whether Davisson understood that his claims (and those of his family members) were subordinate to the claims of Kliegl's administrative and general unsecured creditors. (*Id.*)

**14.** DLNI's original motion to reopen the Chapter 11 sought sanctions only against Kliegl and its principals for Debtor's failure to abide by the deposit order. (Docket Doc.

to chapter 7. (Docket Doc. # 223.) This decision does not address the original claim for sanctions other than to deny them because it appears that DLNI was aware of the defaults under the deposit order yet did not take prompt action thereon. (See Docket Doc. # 235, Exh. 11–16.) It appears that DLNI was aware of Kliegl's precarious state of affairs during this period but DLNI chose to simply send reminders to Al Vitale, who was the President of Kliegl charged with managing Kliegl's day-to-day affairs, rather than seek judicial intervention. Moreover, DLNI has not provided testimony as to Kliegl's income/revenue stream for the period subject to the deposit order.

Davisson responded on two fronts: (1) on or about June 5, 1997, twenty-one days after DLNI's motion to reopen, Davisson, caused a Chapter 7 petition to be filed for Kliegl in Maine,[15] (The Maine petition) having signed the petition and schedules as the President of Kliegl, and (2) Davisson, still acting on behalf of the Debtor despite the Chapter 7 filing for Kliegl in Maine, had Gottlieb file on behalf of Kliegl opposition to DLNI's motion to reopen.

The Maine petition and attendant papers, signed by Davisson and filed by Roger A. Clement Jr. of the law firm of Verril & Dana, stated that the Kliegl corporation was out of business and predicated venue in Maine on the assets Davisson had moved from New York. Davisson states that it was Verril & Dana who had advised him that he could file the Maine Chapter 7. (1/12/98 Tr. at 63–64). Notably, Kliegl's Maine schedules, signed by Davisson, listed DLNI's fees as a disputed claim. (1/12/98 Tr. at 68).

While the motion to reopen the original Kliegl case was pending, DLNI moved in this court pursuant to Fed.R.Bankr.Proc. 1014(b) to transfer venue of the Maine case to this district. A pre-hearing order (Docket Doc. # 230) was issued directing the parties to frame issues raised by DLNI's two motions. The motions to reopen and to transfer venue were then granted, leaving the sanctions issues raised by DLNI as the remaining issue to be addressed. At a hearing on the motions to reopen and transfer venue, Gottlieb was disqualified from representing Kliegl due to the fact that the Maine Chapter 7 petition had by then been filed and the Maine Chapter 7 trustee had decided not take a position on DLNI's transfer motion. (Order dated 1/7/98, Docket Doc. # 256; Tr. 11/24/97 Tr. at 44–66.)

At the conclusion of those hearings, we concluded that sanctions were warranted

# 223.) In their Pre-Trial Statement filed on September 16, 1997 (Docket Doc. # 234, see tab B, legal issues one through three) and in a Supplemental Memorandum of Law filed on September 11, 1997 (Docket Doc. # 231) DLNI later expanded the request for sanctions to cover the filing of the application for the final decree by Davisson and Gottlieb. Gottlieb, acting on behalf of Kliegl, objected to the expansion of the sanctions prong of the motion (Docket Doc. # 240), but he was later disqualified from representing Kliegl during a November 24, 1997 hearing due to the filing of the Chapter 7 petition for Kliegl in Maine on June 5, 1997. (11/24/97 Tr. at 65.) The sanctions issues were then preserved on consent for a later hearing on December 8, 1997. (Id. at 86.) On the December 8, 1997 return dated Davisson and Gottlieb were each represented by separate counsel and the sanctions hearing resumed without further objection. (12/8/97 Tr. at 13.) But at a later hearing, counsel for Gottlieb and Davisson revived the notice issue (1/20/98 Tr. at 4–20) and were afforded the opportunity to file post-trial briefs. (Id. at 16.) Accordingly, I find that both Davisson and Gottlieb received adequate notice and opportunity to prepare for the hearing on sanctions for the filing of the application for a final decree. See Martin v. Schaap Moving Systems, Inc., 152 F.3d 919 (Table), 1998 WL 405966, *3, No. 97–5042, (2nd Cir. April 20, 1998) (citing In re Stein, 127 F.3d 292, 294–95 (2d Cir.1997)) ("Due process requires that bankruptcy courts provide notice and the opportunity to be heard before imposing Rule 9011 sanctions.").

15. The timing of the Chapter 7 filing on June 5, 1997, is significant. After Kliegl ceased operating in November 1996, Davisson had responded to collection letters from Kliegl's creditors by telling them that the business was no longer operating. (1/12/98 Tr. at 61).

without articulating the grounds or reason for that conclusion and without having made a determination as to who would be subject to which sanctions. This decision addresses those open matters.

## II.  DISCUSSION

### A.  Sanctions Under Fed.R.Bankr.P. 9011

■■■ The test for the imposition of Rule 9011 sanctions is an objective one. *In re HBA East Inc.*, 101 B.R. 411 (Bankr. E.D.N.Y.1989); *In re Dubrowsky*, 206 B.R. 30 (Bankr.E.D.N.Y.1997). DLNI has the burden of proof on the appropriateness of sanctions. Fed.R.Bankr.P. 9011. *See e.g. In re Standfield*, 152 B.R. 528, 534 (Bankr. N.D.Ill.1993); *In re Cedar Falls Hotel Properties Limited Partnership*, 102 B.R. 1009, 1014 (Bankr.N.D.Iowa). Once a prima facie case has been made, the burden shifts to the party from whom the sanction is sought to show a legitimate purpose for the filing. *See In re King*, 83 B.R. 843, 847 (Bankr.M.D.Ga.1988) (sanctions sought for filing of the bankruptcy petition).

### *Final Decree & Standards*

"Title 11 U.S.C. § 350(a) instructs that *after an estate is fully administered* and the court has discharged the trustee, the court shall close the case." *In re Jay Bee Enter., Inc.*, 207 B.R. 536, 538 (Bankr. E.D.Ky.1997) (Emphasis supplied.). Senate Report No. 95–989, part of The Revision Notes and Legislative Reports for § 350 of the 1978 Act, states that "[t]he Rules of Bankruptcy Procedure will provide the procedure for case closing." *See* 28 U.S.C.A. § 350. Fed.R.Bankr.P. 3022 provides that *"after an estate is fully administered* in a chapter 11 reorganization case, the court, on its own motion or on motion of a party in interest, shall enter a final decree closing the case." (Emphasis supplied.)

Precisely what constitutes "fully administered" for the purpose of Fed.R.Bankr.P. 3022 has not been addressed by the Second Circuit, *Ericson v. IDC Services Inc.*

*(In re IDC Services Inc.)*, 1998 WL 547085, No. 97 Civ 3081(TPG), 93 B 45992(SMB) (S.D.N.Y. Aug. 28, 1998) ("the Second Circuit has not defined the term 'fully administered' "), and since the entry of a final decree is essentially an administrative task, any analysis or enunciation of the standards applicable to the final decree process must, of necessity, be limited largely to hornbooks and the Advisory Committee Note (Note) that accompanies the Rule. *See In re Beechknoll Nursing Homes, Inc.*, 202 B.R. 260, 261 (Bankr. S.D.Ohio 1996) (The final decree does not adjudicate any rights between the parties and is more of an administrative step to allow the clerk's office to dispose of the fully administered case file); *In re Greater Jacksonville Transp. Co. v. Willis (In re Greater Jacksonville Transp. Co.)*, 169 B.R. 221, 224 (Bankr.S.D.Fla.1994); *In re Mold Makers, Inc.*, 124 B.R. 766 (Bankr. N.D.Ill.1990) (adopting the then proposed Committee Note); *In re Pacor, Inc.*, 1995 WL 355238, Nos. 86–3251, 86–3252 (E.D.Pa. June 13, 1995) (District Court affirming Bankruptcy Court's order declaring entry of final decree relying solely on language found in the Advisory Committee Note). The most compelling comment in the Note advises that: "[e]ntry of a final decree closing a chapter 11 case should not be delayed solely because the payments required by the plan have not been completed" and further that

"[t]he court should not keep the case open only because of the possibility that the court's jurisdiction may be invoked in the future. A final decree closing the case after the estate is fully administered does not deprive the court of jurisdiction to enforce or interpret its own orders and does not prevent the court from reopening the case for cause pursuant to § 350(b) of the Code."

■■■ Both the Rule and the Note make clear that the decision as to whether a final decree is appropriate belongs to the court and not the debtor or debtor's attorney—their responsibility, as the party in

interest seeking the decree, is to perform the "reasonable inquiry" mandated by Fed.R.Bankr.P. 9011 to enable a full and complete disclosure. *See* 11 Collier on Bankruptcy ¶ 9.01[3] (Lawrence P. King ed., 15th ed. rev.1998) ("hereinafter") (noting that motion for final decree, as with all signed papers, is subject to Rule 9011). The fact that the application and entry of the final decree may be merely administrative in nature, does not abrogate the duty to provide the court with all information necessary to make an informed determination as to whether a closing of the case is appropriate. Even though it may contain no blatant inaccuracies or intentional misstatements, an incomplete report which fails to alert the court to material disputes or other unresolved administrative matters cannot, by definition, be a final report since there are still open matters of estate administration. A final report should be just that: a report evidencing facts from which the court can make a determination of finality based upon a finding that there are no administrative tasks remaining to be completed.

The Advisory Committee Note to Rule 3022 contains a list of non-exclusive factors or events that Courts have weighed in determining whether to close a chapter 11 case: 1) whether the order confirming the plan has become final; 2) whether deposits required by the plan have been distributed; 3) whether the property proposed by the plan to be transferred has been transferred; 4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan; 5) whether payments under the plan have commenced; and 6) whether all motions, contested matters, and adversary proceedings have been finally resolved.

Fed.R.Bankr.P. 9011 requires a signature which is treated as a certificate that the person who signs has (1) read the document; (2) performed a reasonable inquiry to assure that the signed documents "is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;" and (3) "that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation or administration of the case." By virtue of the "reasonable inquiry" requirement, negligent misstatements may invoke the same consequences as intentional ones.

The factors set forth in the Note are plainly an aid or checklist that serves to insure that there is no unfinished business before the Court or in the case.[16] With this purpose in mind, it follows that an applicant seeking a final decree must—subject to the reasonable inquiry and improper purpose proscriptions found in Fed. R.Bankr.P. 9011—provide the court with information sufficient to enable it to assess, at minimum, whether and to what extent these factors have been met.

Even with the factors sets forth in the Note, the meaning of "fully administered", which is nowhere defined in the Code, the Rules or the Note, is somewhat elusive. We submit however, that at minimum, the concept must mean that administrative claims have been provided for at least to the extent that assets exist out of which administrative claims can be partly or wholly paid. While we have not been able to find a case specifically holding that "fully administered" requires that administrative creditors be provided for, we note that § 507(a)(1) administrative expenses are required by § 1129(a)(9) to be provided for in full in the plan as a prerequisite

---

**16.** While recognizing that the list in the advisory note is nonexclusive, at least two courts have given a narrow interpretation to the list by observing that the list "is indicative that the only preconditions to entry of a final decree are those relating to the plan and/or the order of confirmation." *In re Precision Autocraft, Inc.,* 197 B.R. 901, 908 (Bankr. W.D.Wash.1996); *In re Indian Creek Limited Partnership,* 205 B.R. 609, 611 (Bankr.D.Ariz. 1997).

to confirmation except to the extent that the holder of such claim has otherwise agreed.

The Kliegl estate could not have been fully administered so long as it still contained assets sufficient to make some payment on account of administrative claims unless those claims had been otherwise provided for. Even though these remaining assets were generally considered to be of doubtful value, we will not listen to Davisson assert their lack of any value in view of the fact that he transported them to Maine where he used them as the sole justification for that venue of the Maine case pursuant to 28 U.S.C. § 1408.[17] If they were of sufficient value to provide good faith grounds for venue, they were of sufficient value to have provided a means for making at least some payment to DLNI; if they were of little or no value, then given the fact that Kliegl was no longer operating, the Maine chapter 7 filing was spurious. Furthermore, in the unlikely event that Gottlieb and Davisson in good faith had concluded either a) that the precise value of these remaining assets lay precisely upon the knife edge boundary sufficient to warrant the filing, sufficient for venue, but insufficient to be meaningful to DLNI, or b) that DLNI had been "otherwise provided for" by the vigorously disputed 3% accommodation or agreement, their knowledge of DLNI's strenuous assertion to the contrary imposed upon them at least the obligation to afford DLNI minimal due process: notice of the final report and application to close the case, together with an opportunity to be heard thereon.

### 1. *Gottlieb*

■ Gottlieb asserts that the application and report seeking a final decree did not "run afoul" of the Bankruptcy Code.[18] (12/8/97 Tr. at 178) (Dkt.# 269). This conclusion can be supported only by a strained reading of the appropriate authorities. While the final report and application may not have contained outright misstatements, significant omissions therein, later discussed in detail, resulted in a highly skewed, if not intentionally misleading picture of the debtor. An examination of the papers and Gottlieb's testimony reveals convenient assumptions and a consistent lack of judgment unerringly in favor of Davisson's interests—the totality of which indicates that the omissions in Gottlieb's application were the product of something more than inadvertence or mischance.

### a. *Substantial Consummation*

■ At trial, Gottlieb steadfastly adhered to the erroneous position that substantial consummation was the exclusive requirement for obtaining a final decree. (12/8/97 Tr. at 233–5; 296, 298, 305–9, 357). While this may be consistent with the applications for a final decree that he drafted for Kliegl, it is not consistent with the requirement set forth in both 11 U.S.C. § 350(a) and Fed.R.Bankr.P. 3022 that the case be fully administered. In fact, neither § 350(a) nor Fed.R.Bankr.P. 3022 is

---

17. 28 U.S.C. § 1408 reads:

Except as provided in section 1410 of this title, a case under title 11 may be commenced in the district court for the district—

(1) in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity that is the subject of such case have been located for the one hundred and eighty days immediately preceding such commencement, or for a longer portion of such one-hundred-and-eighty-day period than the domicile, residence, or principal place of business, in the United States, or principal assets in the United States, of such person were located in any other district; or

(2) in which there is pending a case under title 11 concerning such person's affiliate, general partner, or partnership.

18. Notably, these papers deviate from the form proposed in Collier, the use of which would have provided a much more complete picture. We are unaware of any well respected treatise in general use in this district that contains forms consistent with Gottlieb's position or with his papers.

mentioned anywhere in the final report, application or accompanying proposed order, notwithstanding Local Rule 22(a) then in effect which required that "[a]nnexed to every notice of motion shall be an application which sets forth the grounds therefor, including a concise statement of the legal authority which supports the motion." [19]

This omission is very significant. Section 350 is entitled "Closing and Reopening cases." Fed.R.Bankr.P. 3022 is entitled "Final Decree in Chapter 11 Reorganization Case." On two separate occasions, Gottlieb submitted his "Application For Order of Final Decree ..." together with his "Final Report ..." stating "6. This estate is ready to be closed and a Final Decree effecting the same should issue,." That Gottlieb could have done this while overlooking both the only directly controlling Code section and the only relevant Rule is beyond credulity and raises the compelling inference that after careful consideration, Gottlieb had concluded that the sins of omission would be treated less severely than those of misrepresentation. This conclusion is supported by the fact that Form 33 of The Official Bankruptcy Forms, whose use was mandated by Fed.R.Bankr.Proc. 9009 up until 1986 when it was reduced in status to that of a procedural form issued by the Director of the Administrative Office of the United States Courts [20], has as its first substantive sentence the words "The estate of the above named debtor has been fully administered." If, as Gottlieb asserts, (12/8/97 Tr. at 224), he fashioned his application from papers that he had used in earlier cases, the

form that he modified either was or should have been the form earlier mandated which contained the "fully administered" language. The probability of intentional omission becomes even more convincing when viewed in the light of what can at mostly kindly be described as Davisson's apparent indifference toward Kliegl creditors (and at worst, his active desire to frustrate those creditors) best reflected by Davisson's and Gottlieb's opposition both to DLNI's motions to reopen the Chapter 11 case and to transfer venue of the Maine Chapter 7 case. Finally, Gottlieb could not have reached his conclusions regarding the applicability of the "substantial consummation" standard by reference to any applicable statute, pertinent procedural rule, or generally recognized treatise after having conducted any research or after having engaged in any other reasonable inquiry—any of which would have lead him to the appropriate case law, to § 350(a) and to Rule 3022 with its Advisory Note.

"The term 'substantial consummation' is used in two places in chapter 11" (7 Collier on Bankruptcy ¶ 1101.02.) (1) with regard to modification of a plan, and (2) in the context of attempts to dismiss or convert cases in which a plan has been confirmed. *Id.* It is not one of the enunciated prerequisites to the entry of a final decree. In defending his application, Gottlieb relies on case law that utilizes "substantial consummation" as an aide in determining compliance with the "fully administered" standard of § 350(a) and Rule 3022 but he does not adequately explain his failure to seek out, find and then analyze the appro-

**19.** As an indication of the importance given to the requirement that case closing follow full administration, we note that this appears to be the only instance of such a requirement that is contained in both the statute and the rules in virtually identical language. No other mandate appears to have been given such repeated emphasis.

**20.** See page 1 of the 1999 pamphlet supplement to 11 West's United States Code Annotated entitled "Bankruptcy Forms" and for a more detailed history of form 33 which contains the above quoted language, see the discussion entitled "Official Forms" at page 1xii of Norton Bankruptcy Law and Practice 2d., Bankruptcy Rules.

priate statute or rule, or Advisory Note's comments or case law pertinent to his application.[21] His assertion that substantial consummation is the only standard for obtaining a final decree runs afoul of Rule 9011's reasonable inquiry standard; it is simply not warranted by law.[22] *See Ground Systems, Inc. v. Albert (In re Ground Systems, Inc.)*, 213 B.R. 1016, 1018 (9th Cir. BAP 1997) (explaining that "fully administered" and "substantial consummation" are not interchangeable). The only reasonable conclusion that can be drawn from this is either that Gottlieb, laboring under the misapprehension that he was sufficiently familiar with all pertinent statutes, rules, and precedents concluded that any reference thereto would be superfluous, or else that he knew the standard he was enunciating to be erroneous and misleading. For purposes of this portion of our decision, it makes little difference which alternative becomes our finding. Either falls within the mandate for sanctions contained in Rule 9011.

21. For example, the application fails to discuss cases like *Westridge v. Chestnut St. Condominiums, Inc.*, 169 B.R. 594, 596 (E.D.La. 1994), where the district court affirmed bankruptcy court's decision to enter final decree where 100% of the amounts due creditors were paid.

22. One of the bankruptcy court decisions relied upon by Gottlieb to justify the character of his application and report (*See* 12/8/97 Tr. at 309; 1/12/98 Tr. at 265–6; and Gottlieb's Mem. of Law in Oppos. to Mot. Seeking Imposition of Sanctions, Docket Doc. # 269 .) is *In re Jordan Manufacturing Company, Inc.*, 138 B.R. 30 (Bankr.C.D.Ill.1992) which cites to both § 350 and Rule 3022 for the proposition that since the entry of the final decree is a "ministerial" or "administrative" act that does not alter the substantive rights of either creditors or debtors, it therefore may be done without notice. Gottlieb relies on the courts' use of substantial consummation to define the fully administered standard found in § 350 and Rule 3022. He also cites this case as authority for the proposition that "it is not necessary that all steps under a bankruptcy plan be completed before a party files a final report which precedes the entry of a final decree" and the decree should still be entered even where a debtor has defaulted under a plan. Since his cited case discusses § 350

### b. *Failure to Notify Court of Debtor's Circumstances*

Gottlieb was aware of Debtor's perilous condition from his long experience with the Kliegl reorganization, yet he chose not to disclose this to the court.[23] While one of the motives in seeking the decree may have been to remove from Kliegl the "stigma" of Chapter 11, clearly it was not the only, or even the primary one. Moreover, the application and "report" succeeded in its intended effect to mislead this court and frustrate the legitimate goals of DLNI. In signing and submitting the first, unsuccessful, application for a final decree seeking a closing of the case at a time when the fee application of DLNI was still *sub judice*, Gottlieb violated the provisions of 11 U.S.C. § 350(a) which provides that the court shall close a case "... *after an estate is fully administered* ..." (Emphasis supplied.) In submitting the second application for a final decree closing the case together with a final report which represented that "4. Allowed Administra-

and Rule 3022, why did Gottlieb not refer to the requirements contained therein in his application for a final report?

23. *See* n. 9, *infra*. Gottlieb was familiar with Kliegl from the time of its reorganization from his work on the case as an associate in the firm that served as counsel to the operating trustee.(12/9/97 Tr. at 69). (Davisson.) Moreover, Gottlieb was retained post-confirmation to not just file the final decree, but had first worked directly for Kliegl on matters including significant post-confirmation "rent" issues. (See 12/8/97 Tr. at 282.) (with Goldberg?) Even Davisson believed that Gottlieb—who Davisson once referred to as the Kliegl "company attorney" (1/12/98 Tr. at 30)—had to have been aware of Kliegl's perilous straits because of Kliegl's "own difficulty paying Mr. Gottlieb's bills." (12/9/97 Tr. at 69.) Davisson candidly admits to stringing Kliegl along in hopes of landing the big order and also readily admits that many of the initial payments required under the plan were not made. (12/9/97 Tr. at 163) (Compare with final report). From this exposure Gottlieb had to have been aware of Kliegl's dim prospects given Davisson's clinical, single-minded approach to the business.

tive claims have been paid in full or pursuant to agreement" and that "6. The estate is ready to be closed and a Final Decree effecting the same should issue," Gottlieb ran afoul of Fed.R.Bankr.P. 9011, thereby subjecting himself to the sanctions mandated therein.[24]

c. *Failure to Conduct a Reasonable Inquiry*

■ As noted above, an estate can not be fully administered while there are outstanding motions, contested matters, or adversary proceedings pending before the court. *See Matter of Wade*, 991 F.2d 402, 407 n. 2 (7th Cir.1993); *Greenfield Drive Ltd. Partnership v. Calif. Para–Professional Services, Inc.*, 207 B.R. 913, 919 (9th Cir. BAP 1997) (adopting comment in *Matter of Wade*.) This certainly was the situation when Gottlieb submitted his first such application during the pendency of DLNI's substantial fee application. Neither the final reports nor the accompanying applications make any representation with regard to these impediments. Gottlieb acknowledges that he simply modeled his application on a form document that he had used in the past. He also concedes that he never checked the Court's docket of the Kliegl case to determine whether there were any open or pending matters (12/8/97 Tr. at 240–241), nor did he attempt to determine the status of debtor's payments under the plan (12/8/97 Tr. at 234, 235) or question Davisson or the

Debtor as to the existence of any possible disputed matters of which the court should have been made aware. Even if we were to believe Gottlieb's protestation that he was laboring under the erroneous assumption that substantial consummation was not only the controlling, but also the exclusive, standard for the issuance of a final decree, this is not sufficient to justify his failure to comply with Rule 9011's "reasonable inquiry" requirement by checking the proper authorities to determine whether he was justified in representing to the court that the case was ready to be closed.

■ Furthermore, the Final Report represents that "Allowed Administrative claims have been paid in full or pursuant to agreement." Since Gottlieb knew that allowed administrative claims had not been fully paid (certainly at the time that he filed his first application when he was awaiting our decision on DLNI's fee application, and in all likelihood at the time that he filed the second), explicit in his statement is the representation that such agreement actually existed. Gottlieb therefore placed both his reputation and his pocketbook on the line when he affirmatively represented it. He argues that information provided by Davisson, the Lubitz affidavit, and his vague independent memory of a pre-confirmation agreement furnished him with an adequate basis for his belief that there was an agreement between Kliegl and DLNI for purposes of the final report.[25] Even if we give Gottlieb

---

**24.** The last sentence of the version of Fed. R.Bankr.P. 9011 provides:

If a document is signed in violation of this rule, the court on motion or on its own initiative, *shall* impose on the person who signed it, the represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the document, including a reasonable attorney's fee. (Emphasis supplied.)

**25.** Gottlieb's claim that he "ascertained that there was an agreement" (12/8/97 Tr. at 284) is undermined by the facts and his own testimony: information provided by Davisson:

12/8/97 Tr. at 262, [266, 349] (informed of agreement by Davisson) (269 at 5) (relying on unsigned letter—12/8/97 Tr. at 212, which he believed had been signed. Tr. at 213); seeing and relying on the Lubitz affidavit: (12/8/97 Tr. at 210, and 212); recalling the transaction from the time of his employment with the Trustee: 12/8/97 Tr. at 209, 248, 333. Also, Gottlieb testified that he believed that the 3% deal worked out with the court was the product of the original oral agreement. 12/8/97 Tr. at 320. Gottlieb's alleged belief is belied, however, by the specific wording of the Cox letter, *Supra*, which states that the pay out over time would continue only "until otherwise noticed to you by this firm ..." See above, page 9.

the benefit of the doubt by assuming that he did not intentionally perjure himself, his own sworn testimony discloses that he never took any overt steps to verify the existence of the oral agreement. Rule 9011's reasonable inquiry standard "requires at least some affirmative investigation on the part of the attorney." *See Business Guides, Inc. v. Chromatic Communications Enters., Inc.*, 498 U.S. 533, 551, 111 S.Ct. 922, 933, 112 L.Ed.2d 1140 (1991) (Rule 11 imposes an affirmative duty to conduct reasonable inquiry into the facts); *White*, 207 B.R. at 571 (citing cases) ("The attorney ... must explore readily available avenues of factual inquiry."). Sanctions can only be assessed "where no evidence supports the attorney's claim for relief." *Id.* Gottlieb points to the Lubitz affidavit as some evidence which would satisfy his obligation. (12/8/97 Tr. at 210, and 212). However, the oral agreement's existence must be analyzed in the proper context. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401, 110 S.Ct. 2447, 2459, 110 L.Ed.2d 359 (1990) ("to determine whether an attorney's prefiling inquiry was reasonable, a court must consider all the circumstances of a case") (discussing standard of review of sanction granted pursuant to Fed. R.Civ.P. 11).

While Kliegl's continued survival (i.e. Davisson's willingness to continue to fund Kliegl's operations) was largely dependent upon either the existence of an agreement with DLNI or their continued forbearance, Gottlieb never took any steps to confirm that the arrangement was a binding agreement. (12/8/97 Tr. at 363) (see prior footnote discussing his familiarity with Kliegl).

This failure to inquire about the existence of such assumed agreement was unreasonable and unwarranted given its crucial importance to the Kliegl entity. Moreover Gottlieb should have been doubly sure that the few representations set forth in the final report were supportable. Gottlieb did not so much as even attempt to telephone DLNI. How can he be viewed as having performed a reasonable inquiry in filing the final application? *See Oliveri v. Thompson*, 803 F.2d 1265 (2d Cir.1986) (determining whether a pleading is sanctionable, depends, in part, on the difficulty of acquiring sufficient information); *Televideo Systems, Inc. v. Mayer*, 139 F.R.D. 42, 47 (S.D.N.Y.1991) (attorney's inquiry must be reasonable when relying on a client's factual allegations).

Gottlieb asserts that in view of his erroneous interpretation, no inquiry was needed except to insure that there was an initial distribution and agreement. 12/8/97 Tr. at 285.[26] (12/8/97 Tr. at 240) This conclusion has no greater validity than its premise particularly in view of the fact that he sought the case closing without notice to DLNI. Like the child who kills his parents and then asks for mercy on the grounds that he is an orphan, Gottlieb seeks mitigation on the grounds of a situation that he wrongfully placed himself into. Allegedly acting on an erroneous assumption of law, compounded by his failure to inquire, Gottlieb's failure to notify deprived DLNI of the opportunity to oppose the case closing and to request instead a conversion to a chapter seven case which would have increased the likelihood of DLNI receiving a significant distribution on its claim.[27] Proceeding upon a bonafide

26. Gottlieb felt that Kliegl's failure to pay was not material to the court closing the case. 12/8/97 Tr. at 353, 357. He asserted that substantial consummation occurred upon an initial distribution to the Class 4 creditor, John Kliegl. 12/8/97 Tr. at 275–277 (277 citing to plan).

27. Gottlieb's conduct deprived DLNI of the opportunity to oppose the case closing and to request instead a conversion to a chapter seven case in which DLNI would have been afforded the opportunity of seeking a disgorgement proceeding in which all chapter 11 administrative creditors could have been required to share proportionately in any administrative shortfall. A possible motive may have been the vulnerability not only of Gottlieb but also of his former employer, the former trustee to such an apportionment procedure. However, since DLNI has chosen not to raise this issue, neither will we.

erroneous assumption may be a defense to an offence which requires actual knowledge. It is neither a defense nor a plea in mitigation in a situation in which a reasonable inquiry is mandated.

#### d. *Filing the Application and Report Ex Parte*

■ The fact that the application was filed *ex parte* is also highly revealing. Gottlieb argues that no notice was required since a reorganized debtor does not owe any post-confirmation fiduciary duty to creditors. It is true that the bankruptcy rules do not require the application or motion for a final decree to be on notice, but the fact that Kliegl was then for all intents and purposes insolvent places an even heavier duty on the Debtor and compromises Gottlieb's argument. This lack of notice had the expected and unjust effect of excluding any creditor, such as DLNI, that Gottlieb had reason to believe may have had good reason to object to the closing of the case. This exclusion could have been averted: either the final report could have disclosed the circumstances surrounding Kliegl's grim prospects (and the dispute with DLNI) or it could have been fashioned as Collier's suggests. *See* 11 Collier ¶ 6.01(3) (notice of a motion for a final decree "should be given to all persons affected, the trustee, if there is one, and such other persons as the court may direct"). In either case, this Court would then have been aware of the defaults and would have been able to determine whether or not interested parties should have been provided with notice. Instead, Gottlieb's conveniently circumscribed approach to the application (from failing to mention controlling authority to filing the applica-

tion *ex parte*) kept from this court of relevant information which conveniently deprived potentially interested parties of an opportunity to object to the application.[28] Misleading a court into believing that there is no controversy by depriving an adversary the opportunity to be heard is simply not to be condoned by any civilized judicial system.

Gottlieb's behavior, by itself, however, was not the sole cause of DLNI's long journey in attempting to get its fees paid. DLNI at that time was a capable and prestigious law firm. The application for order of final decree was refiled in March 1996—the motion to reopen, including the sanctions being sought herein, was filed in the summer of 1997. In this time the Debtor faltered, and Davisson hauled (literally) its remains to Maine. DLNI had ample time to act against Kliegl and/or Davisson. A sophisticated law firm with a substantial outstanding administrative fee award can not claim to have been hoodwinked by the closing of the case. The entry of the final decree in of itself worked only minimal prejudice to DLNI—presumably limited to their expenses in seeking to reopen the case. What is more significant is what followed the filing of the application. This will be addressed in the discussion of Gottlieb's vulnerability under 28 U.S.C. § 1927. His Rule 9011 sanction will therefore be limited to the facts surrounding the preparation and filing the final reports and applications to close the case.

#### 2. *Davisson*

■ The applicability of Fed. R.Bankr.P. 9011 to Davisson raises an interesting question. Rule 9011 as then in effect[29] provided: "If a document is signed

---

28. Moreover, since "[t]he Code and the rules do not specify when a case has been fully administered," (9 Collier ¶ 3022.01), Colliers advises that "[t]he motion should show compliance with the confirmed plan and all orders relating to its consummation," 11 Collier ¶ 6.01(3), and that notice "should be given to all persons affected, the trustee, if there is one, and such other persons as the court may direct." This is a prudent recommendation

since such notice provides the court with the added safeguard that it will receive accurate information sufficient to make its analysis in deciding whether to order the entry of the final decree.

29. Fed.R.Bankr.P. *9011* was amended effective December 1, 1997.

in violation of this rule, the court … shall impose on the *person* who signed it … an appropriate sanction.…" (Emphasis supplied.) Section 101(41) of Title 11 and generally accepted legal usage includes "corporation" within the term "person." Davisson signed the final report as Kliegl's Secretary. For purposes of Rule 9011 sanctions, is "the person who signed it" Davisson, or is it Kliegl? There is no bright line answer to this question. *Compare Caldwell v. Unified Capital Corp. (In re Rainbow Magazine, Inc.)*, 77 F.3d 278, 282 (9th Cir.1996) (affirming individual sanction under Rule 9011 against principal of Chapter 7 corporate debtor) *and White v. Creditors Service Corporation*, 207 B.R. 567, 574 (Bankr.S.D.Ohio 1997), *with Jones v. Bank of Santa Fe (In re Courtesy Inns )*, 40 F.3d 1084 (10th Cir.1994); *Gelt v. Janowitz (In re Chisholm Co.)*, 166 B.R. 706 (D.Colo.1994). The answer must be determined on a case by case basis taking into account both the person/entity whose statutory obligation is satisfied by the signature and the person/entity for whose benefit the signature was affixed.

To determine whether sanctions are appropriate with regard to Davisson individually requires an examination of his two separate roles: that of individual investor, and that of corporate secretary. Employed as an investment broker and advisor, Davisson also invests in a "diverse group of start-up companies" with his own money. (12/9/97 Tr. at 126) That Davisson did not leave his job on the day after he obtained his controlling interest in Kliegl makes it clear that his motivation in investing in the Debtor was not to embark on a second career in the lighting industry. Having gained control of an admittedly marginal company, Davisson's driving motivation was to keep the company afloat long enough to land—in the words of his own attorney at trial—the "big kahoona order" in hopes of getting a return on his investment. (1/02/98 Tr. at 326–327.)

■ Everything about Davisson's involvement with the Debtor was calculated and carefully thought out to the end of benefitting only Davisson. During the reorganization, at a time that he was without authority to bind the Debtor, Davisson claims to have reached out to DLNI and negotiated a plan for the payment of DLNI's claim in exchange for Debtor's silence on DLNI's fee application. In so doing, he ignored the fiduciary obligation owed by an officer of a debtor corporation in a title 11 proceeding to the creditors of the estate. To the extent that he in good faith believed he may have had grounds to object to the pending fee application, he had a duty to bring it to the attention of the court either in the form of asserting the objection or by seeking court approval of the alleged compromise after having provided the proper notice to the creditor body. Instead, he chose to use such information exclusively for his own purposes. At the time of confirmation, he had made his own personal limited representations to meet Kliegl's obligations.[30] Later, while keeping DLNI at bay with repeated threats to pull out of Kliegl, he signed the final report in his capacity as an officer of Kliegl notwithstanding his knowledge of DLNI's pending fee application. And in an effort to blunt the effect of DLNI's motion to reopen the Kliegl case and seek relief on its unpaid administrative claim, Davisson retained separate counsel to file a Chapter 7 petition for Kliegl in Maine (relying on the scant remaining debtor's physical assets that he had hauled to Maine as the means to satisfy venue requirements), while he utilized Gottlieb in New York to oppose DLNI's motion to transfer the case to this court.[31]

30. When asked at trial whether he had committed to an absolute funding commitment to the cash requirements of Kliegl at the time of confirmation, Davisson responded: "As long as [Kliegl] met its sales and margins' projections." (12/9/97 Tr. at 139.)

31. There have been neither allegations nor evidence as to the extent to which Davisson may have been aware of the different order of priority afforded to DLNI's unpaid administrative fee claim in a) the about to be closed confirmed Chapter 11 case, b) a Chapter 7

From all of this, it is clear that both before and after the filing of the final report Davisson's efforts were directed primarily towards enhancement of his own personal financial interests rather than for the purpose of fulfilling the debtor's fiduciary obligation to its creditors, and that therefore the consequences of the offending signature should fall upon his shoulders rather than on those of the now defunct debtor corporation. There is no dispute that Davisson was the catalyst for the filing of the final report. *See White*, 207 B.R. at 574 ("Sanctions can be levied on the attorney as the signer of the pleading, the client as the catalyst behind the pleading, or both, based on the allocation of appropriate culpability.") (citing cases) ("[T]his Court feels duty bound, although not requested, to impose sanctions against Ms. Cooley as the catalyst behind the efforts of Mr. Pettigrew and A & H.") (client sanctioned under 9011 based on prior holding that client had "acted fraudulently to conceal from creditors and the Trustee assets of the estate. . . .").

Moreover, there was no statutory obligation or other compelling reason for the Debtor to have filed its final report at the time that it did, particularly since all of the representations prerequisite thereto could not then be bona fide made. On the other hand, Davisson was in a "heads I win, tails you loose" situation—he only stood to gain by closing the case. In the short term he ostensibly had removed the chapter 11 "stigma" from the Debtor, thereby increasing the likelihood that the Debtor would obtain the big order which could yield a positive return on his investment. The final decree also was sought as a roadblock to creditors such DLNI who had already threatened to take action on their claim.

At a very minimum, both Kliegl and Davisson benefitted from the final decree. Together with the benefits should go the burdens. Under these circumstances, we have no difficulty in interpreting "person" so as to include both Davisson individually as the "person" susceptible to Rule 9011 sanctions.

▉▉▉▉▉ Only to the extent that any doubt may still remain as to Davisson's vulnerability to Rule 9011, we believe that given the facts of this case it would not be inappropriate to utilize this court's inherent powers to effect an appropriate result.[32]

## B. 28 U.S.C. § 1927

28 U.S.C. § 1927 targets the attorney who "multiplies the proceedings in any case unreasonably and vexatiously." Clearly Davisson, a non-lawyer, can not be subject to this statute, but before we address Gottlieb's exposure, our own jurisdiction to proceed under this statute must be examined.. This will be done in three stages: 1) is the bankruptcy court "a court of the United States;" 2) if it is not, is a bankruptcy court empowered to exercise the powers given to "a court of the United States" for the purposes of § 1927; and 3) is utilization of § 1927 really limited to courts of the United States?

### 1. Is the bankruptcy court a "court of the United States?"

Section 1927, reads:

Counsel's liability for excessive costs:

Any attorney or other person admitted to conduct cases in any *court of the United States* or any Territory thereof who so multiplies the proceedings in any

---

conversion from the sought to be closed Chapter 11 case, or c) the newly filed or about to be filed Maine Chapter 7 case.

**32.** A bankruptcy court also has the inherent power to sanction. *Fellheimer, Eichen & Braverman, P.C. v. Charter Technologies, Inc.*, 57 F.3d 1215, 1225 (3rd Cir.1995); *Glatter v. Mroz (In re Mroz )*, 65 F.3d 1567, 1574 (11th Cir.1995); *Rainbow Magazine,* 77 F.3d at 284; *Mapother & Mapother, P.S.C. v. Cooper (In re Downs )*, 103 F.3d 472, 477 (6th Cir.1996); *In re Courtesy Inns, Ltd., Inc.*, 40 F.3d at 1089–90; *see also, In re Arlan's Department Stores, Inc.*, 615 F.2d 925, 943 (2d Cir.1979) (recognizing bankruptcy court's inherent power to deny fees and disbursements).

case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct. (Emphasis supplied.)

Section 451 provides in relevant part:

The term "court of the United States" includes the Supreme Court of the United States, courts of appeals, district courts constituted by chapter 5 of this title, including the Court of International Trade and any court created by Act of Congress the judges of which are entitled to hold office during good behavior.

■ At the outset, we note that the statutory definition of "court of the United States" is non exclusive. Clearly, The Congress thereby indicated its intent for that term to embrace courts in addition to those enumerated, although the statute itself does not indicate the outside limits of what that term may encompass.

Two circuits courts of appeal confronted with the issue of whether a bankruptcy court is a court of the United States for purposes of § 1927 have either declined to decide the issue, *In re Volpert*, 110 F.3d 494, 500 (7th Cir.1997) (we "leave unanswered whether bankruptcy judges can exercise the authority of a 'court of the United States'" for the purposes of § 1927), or decided that since a bankruptcy court is not a court of the United States, the bankruptcy court is not authorized to award sanctions under § 1927. *In re Courtesy Inns, Ltd.*, 40 F.3d at 1085–86 (10th Cir. 1994) (although the Tenth Circuit affirmed the bankruptcy court's imposition of sanctions under 11 U.S.C. § 105(a) to prevent an abuse of process.) [33]

In conducting their analysis of § 451, the Courtesy Inns and Volpert courts looked to the following factors: (1) that bankruptcy courts are not listed explicitly in § 451; (2) that bankruptcy judges are constituted under chapter 6 rather than chapter 5 of Title 28; (3) that the "entitled to hold office during good behavior" language excludes bankruptcy judges who serve a specified fourteen year term; and (4) that an enacted amendment to the Bankruptcy Reform Act of 1978 explicitly adding bankruptcy court to the § 451 definition, was repealed prior to its effective date. *Volpert*, 110 F.3d at 498–99 (discussing *Perroton v. Gray (In re Perroton )*, 958 F.2d 889 (9th Cir.1992) (analyzing § 451 for purposes of determining whether the bankruptcy court is a court of the United States in the context of authority to permit a party to proceed *in forma pauperis* under 28 U.S.C. § 1915); *Courtesy Inns*, 40 F.3d at 1086 (analyzing § 451 for purposes of § 1927)).

Volpert relied heavily upon the reasoning contained in Perroton, a significant factor of which was the effect that it gave to Congress' aborted attempt to include the bankruptcy court within the meaning of "court of the United States" in 28 U.S.C. § 451. Perroton noted that an act which had amended § 451 so as to add to the enumerated courts of the United States "bankruptcy courts, the judges of which are entitled to hold office for a term of 14 years" was repealed before it was to become effective in 1984 and concluded therefrom that Congress had intended that the bankruptcy court not be included within the meaning of "court of the United States."

■ With due respect to the 9th Circuit, while Congress' revocation of the yet to become effective amendment to § 451 may have manifested Congress' intent and desire at that time, Congress did nothing to implement such intent. Since it never

---

**33.** 11 U.S.C. § 105(a) states: The court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

552

succeeded in effecting any change to the statute in effect prior to the stillborn amendment, the version of the pertinent portion of the current version of § 451 now in effect is the version continuously in effect throughout and notwithstanding Congress's 1984 legislative juggling. Having reinstated (or, more properly, "retained") the original statute, the legislative intent to which we must look for guidance is the intent, if any, manifested with regard to the original enactment. Unimplemented retrospective legislative pronouncements of what a current Congress now interprets a former Congress to have intended is hardly the equivalent of a statutory enactment. Therefore, § 451 must be interpreted wholly without resort to the historical analysis upon which *Perroton* and its progeny relies.

The Second Circuit in *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indust. Terminal, Inc.)*, 931 F.2d 222, 230 (2d Cir.1991), stated that

> [a] bankruptcy court may impose sanctions pursuant to 28 U.S.C. § 1927 if it finds that "[an] attorney's actions are so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose or delay."

The language cited by the Second Circuit came from *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir.1986), *cert. denied sub nom., County of Suffolk v. Graseck*, 480 U.S. 918, 107 S.Ct. 1373, 94 L.Ed.2d 689 (1987), a case which neither arose out of nor analyzed bankruptcy court jurisdiction.[34]

The second paragraph of the Court of Appeals Cohoes decision states: "On this appeal, we address whether *a court* may assess sanctions . . . ," (Emphasis supplied) and in neither the bankruptcy nor the district court decision is there a discussion of the authority of a bankruptcy court to impose sanctions under 28 U.S.C. § 1927.

*See In re Cohoes Indust. Terminal, Inc.*, 103 B.R. 480 (Bankr.S.D.N.Y.1989), *rehrg. den.*, 105 B.R. 243 (Bankr.S.D.N.Y.1989). Furthermore, the above quoted statement of The Court of Appeals was made only within an analysis of abuse of discretion in imposing § 1927 sanctions and not with regard to jurisdiction to impose them. Prudence therefore dictates that rigid adherence to this pronouncement not be resorted to beyond the narrow context within which it was uttered.

Finding neither binding authority, persuasive precedent nor compelling necessity to answer our first question, we move on.

2. Is the bankruptcy court authorized to exercise the powers given to a district court as a court of the United States, so denominated by § 451?

28 U.S.C. § 1334(a) states:

Except as provided in subsection (b) of this section, the district court shall have original and exclusive jurisdiction of all cases under title 11.

28 U.S.C. § 151 states in pertinent part:

In each judicial district, the bankruptcy judges in regular active service shall constitute a unit of the district court to be known as the bankruptcy court for that district. Each bankruptcy judge, as a judicial officer of the district court, may exercise the authority conferred under this chapter with respect to any action, suit, or proceeding and may preside alone and hold a regular or special session of the court, except as otherwise provided by law or by rule or order of the district court.

28 U.S.C. § 157(a) provides:

Each district court may provide that any or all cases under title 11 and any or all proceedings arising under title 11 or arising in or related to a case under title 11 shall be referred to the bankruptcy

---

34. Nevertheless, *Cohoes* has been relied upon for the above quoted proposition. See *In re French Bourekas, Inc.*, 175 B.R. 517, 523–25 (Bankr.S.D.N.Y.1994) and *In re Eatman*, 182 B.R. 386, 396 (Bankr.S.D.N.Y.1995).

judges for the district. The United States District Court for the Eastern District of New York has so referred such title 11 matters to this bankruptcy court. (See the appendix to *Acolyte Electric Corp. v. City of New York*, 69 B.R. 155 (1986).)

▮ Even if this court were not a court of the United States under § 451, given the open-ended language of § 1927, we see no reason why our authority to exercise the district court's jurisdiction in this matter as a core proceeding concerning the administration of the estate pursuant to 28 U.S.C. § 157(b)(2)(A) should be any more circumscribed than our authority to exercise the district court's jurisdiction to hear undisputedly core matters such as the original fee application or, for that matter, to have signed the order confirming the debtor's plan of reorganization or the order closing the case, or to have performed any other judicial function necessary to the administration of this or to any other title 11 case referred to this court by the district court.

In addressing matters arising within our statutorily circumscribed core jurisdiction, bankruptcy courts clearly have need of § 1927. § 1927's underlying purpose is best discerned in the context of the mandate found in Rule 1 of the Federal Rules of Civil Procedure which provides that the civil rules "shall be construed and administered to secure the just, speedy, and inexpensive determination of every action." (Fed.R.Civ.P. 1.)[35] § 1927 provides the substantive means for enforcement of the policy articulated in Rule 1. At the time of the adoption of the Federal Rules in 1938, § 1927's predecessor, with substantially

similar wording, was already in place. *In re Volpert*, 110 F.3d at 498, n. 3.

The fundamental problem with denying to the bankruptcy courts § 1927 authority is that it would force bankruptcy court to resort to less satisfactory alternate means of enforcing their identical mandate set forth in Rule 1001 of the Federal Rules of Bankruptcy Procedure.[36] Rule 1001 dictates a policy of interpretation; it does not provide the court with a means of enforcement of that policy. By itself, Rule 9011 falls short of that implementation. For example, Rule 9011 does not apply to a procedure that a party may be entitled to utilize but which is excessively invoked on an unconscionably large number of occasions. The enforcement authority in such a situation is § 1927, without the use of which a bankruptcy court would be compelled to look either to 11 U.S.C. § 105(a) or to the court's amorphous "inherent powers."

▮ Section 105(a) does not provide an appropriate basis for imposing sanctions. Sections 1927 and 105(a) are complimentary. Section 1927 acts retrospectively by authorizing sanctions for past activities. Section 105(a) speaks merely prospectively, empowering the bankruptcy court to take action "to prevent an abuse of process." Section 1927 is therefore the only statutory authority sufficient to address the problem. With due respect to those courts that have upheld sanctions for past actions under section 105(a), one does not prevent an abuse by restricting authority to issue sanctions until after the abuse has been committed.

▮ While this Court acknowledges its inherent powers (and as evidenced by this

---

**35.** Fed.R.Civ.P. 1 states: "These rules govern the procedure in the United States district courts in all suits of a civil nature whether cognizable as cases at law or in equity or in admiralty, with the exceptions stated in Rule 81. They shall be construed and administered to secure the just, speedy, and inexpensive determination of every action."

**36.** Fed.R.Bankr.P. 1001 states: "The Bankruptcy Rules and Forms govern procedure in cases under title 11 of the United States Code. The rules shall be cited as the Federal Rules of Bankruptcy Procedure and the forms as the Official Bankruptcy Forms. These rules shall be construed to secure the just, speedy, and inexpensive determination of every case and proceeding."

decision, in appropriate situations it will not hesitate to utilize those powers), we also recognize that since by definition inherent powers have been neither statutorily defined nor statutorily circumscribed, they should be used sparingly and only where absolutely essential. Consistent with a restrained rule of law, it is far more appropriate, whenever possible, to use an appropriate statute (and case law construing that statute) in defining the boundaries of acceptable conduct.

Fed.R.Bankr.P. 1001 is almost identical to Fed.R.Civ.P. 1. Its policy is obviously identical to its civil counterpart. At the time that § 1927 or its predecessor was enacted, Congress could hardly have been expected to consider the specific effect that would be imposed upon a post Marathon bankruptcy court. However, at the time that Fed.R.Bankr.P. 1001 was adopted, Fed.R.Civ.P. 1 was already enjoying the enforcement authority afforded by § 1927. It is inconceivable that Fed. R.Bankr.P. 1001 would have been adopted without the expectation that its almost identical wording and its identical policy would enjoy identical enforcement. We are therefore loathe to frustrate that expectation by indulging in an unnecessarily constricted interpretation of § 1927.

We acknowledge the contrary majority. However, in view of the fact that the question is open in this circuit, and since the majority predicates its analysis upon the assumption, erroneous in our humble and respectful opinion, that § 1927 powers are restricted exclusively to courts of the United States together with the conclusion that bankruptcy courts are not courts of the United States, and since we are aware of neither precedent nor logic which would deny us the authority to impose § 1927 sanctions after adhering to the clear and unambiguous wording of that statute, we are comfortable in proceeding thereunder. Since resolution of this conflict does not require an analysis of whether the bankruptcy court is a court of the United States, all this court concludes is that for sanctions purposes we are entitled to issue sanctions under § 1927.

3. Is § 1927 really limited to utilization only by courts of the United States?

▇ The *Volpert* Court recognized the need for a bankruptcy court to possess the authority to address the problems anticipated by § 1927 and resolved the dilemma by resorting to § 105(a).[37] Utilizing § 105(a), however, is not a solution—it simply sidesteps the jurisdictional ambiguities. In this Circuit it is clear that § 105(a), by its very terms, "limits the bankruptcy court's equitable powers, which must and can only be exercised within the confines of the Bankruptcy Code". *Fed. Deposit Ins. Corp. v. Colonial Realty Co.,* 966 F.2d 57, 59 (2nd Cir.1992) (internal quotation marks omitted) *citing Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, 108 S.Ct. 963, 968, 99 L.Ed.2d 169 (1988); *see also Momentum Mfg. Corp. v. Employee Creditors Comm., (In re Momentum Mfg. Corp.),* 25 F.3d 1132, 1136 (2nd Cir.1994) (Second Circuit observing that the § 105(a) power is not unlimited, citing to *In re Joint Eastern & Southern Dist. Asbestos Litig.,* 982 F.2d 721, 751 (2d Cir.1992) ("equitable considerations ... not a license to courts to invent remedies that overstep statutory limitations.")) Furthermore, as discussed above, § 105(a) does not provide an appropriate basis for imposing sanctions for past behavior.

▇ However a close reading of § 1927 discloses nothing which requires that in order to impose the sanctions authorized by that section the court must fall within the § 451 definition. The "court of the United States" limitation contained in § 1927 is a limitation not upon the court which imposes the sanctions, but rather one upon the attorneys whose proscribed behavior may invoke the statute's sanctions. As we read the statute, the only

---

**37.** See note 32 above.

limitation upon the imposition of the appropriate statutory sanctions upon attorneys who engaged in the proscribed behavior is that the person subject to those sanctions be "... admitted to conduct cases in any court of the United States or any Territory thereof ..." There simply is no enunciated statutory restriction as to which court may exercise such authority. *Novelty Textile Mills, Inc. v. Stern,* 136 F.R.D. 63, 74–75 (S.D.N.Y.1991).[38]

While this Court is quick to acknowledge that it is a court of narrowly defined jurisdiction, we nevertheless believe that Congress gave this Court the jurisdiction to address these types of issues at least under the facts of this case. To the extent that any reviewing court chooses not to adopt this analysis, we reluctantly assert our inherent authority to address Gottlieb's behavior.

2. Analysis of Gottlieb's Conduct Within the Context of 28 U.S.C. § 1927

By obtaining the final decree and opposing DLNI's motions, Gottlieb engaged in conduct that unreasonably and vexatiously multiplied the proceedings in this case. For the reasons set forth above in connection with Fed.R.Bankr.P. 9011, we conclude that Gottlieb possessed the requisite bad faith needed to warrant sanctions, preferably under § 1927 but if necessary, then under our inherent powers. The final decree made it necessary for DLNI to move to reopen the case, and Davisson responded by filing the Chapter 7 for Kliegl in Maine and having Gottlieb—ostensibly on behalf of Kliegl—oppose both DLNI's motion to reopen and their motion to transfer venue of the Maine case to this court. (*See* Order concerning purported representation of Kliegl Chapter 7 debtor entity by Gottlieb dated 1/9/98, Docket Doc. # 256.)

---

**38.** The *Volpert* court attempted to dispatch the Novelty Textiles Mills approach by looking to § 1927's predecessor. *Volpert,* 110 F.3d at 498, n. 3. The cited note in *Volpert* traces some of the history of § 1927 and points out that one of its earlier versions had contained language restricting the imposition of costs to the proscribed behavior committed in a court of the United States. We submit that the removal of such restriction supports our broader reading of § 1927.

## III. CONCLUSION

At the close of the hearing in this matter, this Court made a threshold as to the sanctionability of respondent's conduct. A further hearing is now necessary to resolve several final matters: the ability of Davisson and Gottlieb to shoulder sanctions, the extent of appropriate sanctions, and an how those sanctions should be equitably apportioned.

A hearing will be set by the judge to whom this case will be transferred. Appropriate notice shall be given of the time, date, and location of such hearing.

It is So Ordered.

## APPENDIX

FINAL REPORT OF SUBSTANTIAL CONSUMMATION PURSUANT TO FIRST AMENDED PLAN OF REORGANIZATION OF KLIEGL BROS. UNIVERSAL ELECTRIC STAGE LIGHTING CO., INC.

TO: THE HONORABLE MARVIN HOLLAND

UNITED STATES BANKRUPTCY JUDGE:

Kliegl Bros. Universal Stage Lighting Co., Inc. ("Debtor"), by its attorney Lawrence Gottlieb, Esq., respectfully sets forth and shows:

1 A First Amended Plan of Reorganization dated June 12, 1992, as amended ("Plan"), filed herein by the Debtor, was confirmed pursuant to order of this Court dated October 2, 1992 (the "Confirmation Order").

2 Pursuant to the Plan, substantial consummation was defined as the date that first distribution to Class 4 Claimants under the Plan were made.

3 First distribution payments under the Plan on account of the sole Class 4 Claimant, John Kliegl, have been made.

4 Allowed Administrative claims have been paid in full or pursuant to agreement.

5 Debtor's Plan has been substantially consummated.

6 This estate is ready to be closed and a Final Decree effecting the same should issue.

Dated: White Plains, New York

October 16, 1995

LAWRENCE M. GOTTLIEB, ESQ.
Attorney for Kliegl Bros.
Universal Electric Stage
Lighting Co., Inc., Debtor
/S

Dated: Cape Elizabeth, Maine

October 14, 1995

KLIEGL BROS. UNIVERSAL
ELECTRIC STAGE LIGHTING CO.,
INC.
/S
RICHARD DAVISSON, Secretary

APPLICATION FOR ORDER OF FINAL DECREE FOR KLIEGL BROS. UNIVERSAL ELECTRIC STAGE LIGHTING CO., INC. CASE NO. 191–13001–352

TO: THE HONORABLE MARVIN HOLLAND

UNITED STATES BANKRUPTCY JUDGE:

Kliegl Bros. Universal Stage Lighting Co., Inc. ("Debtor"), respectfully moves for an order of Final Decree and represents as follows:

1 The Debtor's plan of reorganization was confirmed pursuant to an order of this Court dated October 2, 1992.

2 As defined by § 1101(2) of Title 11, United States Code ("Bankruptcy Code"), substantial consummation entails a transfer of all or substantially all of the property proposed by the Plan to be transferred; assumption by a debtor or by the succes-

sor to a debtor under the plan of business or the management of all or substantially all of the property dealt with by the plan; and commencement of the distribution under the plan.

3 As evidenced by the final report of substantial consummation, a copy of which is made a part hereof, substantial consummation, as that term is defined by § 1101 of the Bankruptcy Code, is complete. It is respectfully submitted that this case may be closed.

WHEREFORE, the Debtor respectfully prays that this Court enter a final decree together with such other, further and different relief as this Court may deem just, proper and equitable in the premises.

Dated: White Plains, New York

October 16, 1995

LAWRENCE M. GOTTLIEB, ESQ.
Attorney for Kliegl Bros.
Universal Electric Stage
Lighting Co., Inc., Debtor
/S